## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

AMIR SHADMANI,

      Plaintiff,

v.                                                    Case No. 3:22-cv-1008-MMH-SJH

OFFICER J.M. BARNES, et al.,

      Defendants.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendant Sheriff T.K. Waters'
Motion for Summary Judgment and Memorandum of Law in Support
(Doc. 46; Sheriff's Motion), filed March 18, 2024, and Defendants Barnes and
Scott's Motion for Summary Judgment and Accompanying Memorandum of
Law (Doc. 47; Officers' Motion), filed March 18, 2024. Plaintiff Amir Shadmani
timely filed responses to both motions. See Plaintiff's Response in Opposition to
Defendant T.K. Waters' Motion for Summary Judgment and Memorandum of
Law in Support (Doc. 52; Response to Sherriff's Motion), filed April 8,
2024; Plaintiff's Response in Opposition to Defendant Barnes and Scott's
Motion for Summary Judgment and Memorandum of Law in Support
(Doc. 51; Response to Officers' Motion), filed April 8, 2024. Defendants then filed

replies. See Defendant Sheriff T.K. Waters' Reply to Plaintiff's Opposition to Motion for Summary Judgment (Doc. 53; Sheriff's Reply), filed April 22, 2024; Defendant Barnes and Scott's Reply to Plaintiff's Response to Defendants' Dispositive Motion for Summary Judgment (Doc. 54; Officers' Reply), filed April 22, 2024. Accordingly, this matter is ripe for review.

## I. Background[1]

Officers J.M. Barnes and A.G. Scott (collectively "the Officers") are police officers employed by the Jacksonville Sheriff's Office (JSO). See Declaration of Officer J.M. Barnes at 1 (Doc. 48-14; Barnes Declaration); Declaration of Officer A.G. Scott at 1 (Doc. 48-15; Scott Declaration). On September 17, 2019, the Officers were patrolling Southside Boulevard and Baymeadows Road due to a rise in business and auto burglaries in the area. See Barnes Declaration at 2. While on patrol, at approximately 2:55 A.M., Officer Barnes noticed a vehicle parked in front of a closed Panda Express. Id. The vehicle was running, had its lights on, and appeared to be illegally parked as it was "straddling the parking stripe between two spaces." Id. Officer Barnes, believing the vehicle to be suspicious, drove into the parking lot to investigate. Id. Officer Scott, who was

---

[1] Unless otherwise noted, the facts recited herein are undisputed. For the purpose of summary judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to Shadmani; however, the Court notes that these facts may differ from those ultimately proved at trial. See Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (describing the summary judgment standard).

following behind Officer Barnes in a separate patrol car, drove into the parking lot to assist with the investigation. <u>See</u> Scott Declaration at 2.

Once in the parking lot, Officer Barnes exited his patrol car, turned on his body worn camera (BWC), and approached the vehicle's driver side door. <u>See</u> Barnes Declaration at 2; Officer Barnes' Body Worn Camera (Doc. 48-14; BWC Footage).[2] Upon approaching the vehicle, Officer Barnes saw an individual sitting in the driver's side seat, and asked him "what he was doing sitting in his car in the middle of the night." Barnes Declaration at 3. The individual told Officer Barnes that he was "talking to his wife on the phone," and Officer Barnes asked to see his driver's license. <u>Id.</u> The individual complied, handed his driver's license to Officer Barnes, and identified himself as Amir Shadmani. <u>Id.</u> As Officer Barnes continued talking with Shadmani, he observed Shadmani to be "sweating, disheveled and sniffling" and that he had "bloodshot, watery eyes." <u>Id.</u> Officer Barnes then used his flashlight to look inside of Shadmani's vehicle and noticed "a white powdery substance" on a "black folder in the passenger's seat[.]" <u>Id.</u> Believing the substance to be "powdered cocaine," Officer Barnes asked Shadmani to exit his vehicle. <u>Id.</u> Shadmani complied, got out of the vehicle, and Officer Barnes asked Shadmani if he could search him.

---

[2] Officer Barnes' BWC captures the entirety of the events alleged to have occurred. However, the first thirty-seconds of Officer Barnes' interaction with Shadmani does not have audio, as the BWC has a thirty-second delay between when it is activated and when audio begins to record. <u>See</u> Barnes Declaration at 3.

<u>See</u> BWC Footage at 00:50. Shadmani consented to being searched, and Officer Barnes completed a pat down. <u>Id.</u> at 00:50–01:50. Officer Barnes did not find any weapons on Shadmani, but did find "used tissue[s]," which from his experience as a law enforcement officer is "indicative of drug use because snorting cocaine causes one's nose to run." Barnes Declaration at 3–4. While being searched, the Officers asked Shadmani why he was parked outside of the Panda Express. <u>See</u> BWC Footage at 01:15. Shadmani told the Officers that he just got off work an hour ago, and that he was on his way back from a friend's house when he decided to stop in the Panda Express parking lot to talk to his wife. <u>See</u> Barnes Declaration at 4.

After completing his search, Officer Barnes walked Shadmani to his patrol car. <u>Id.</u> Officer Barnes advised Shadmani that he was not under arrest, but placed him in the patrol car's backseat. <u>Id.</u> Officer Barnes then asked Shadmani, "what am I seeing in the passenger seat?" <u>See</u> BWC Footage at 02:15. Shadmani responded, "it's a folder." <u>Id.</u> at 02:18. Officer Barnes then asked Shadmani to "put [his] feet in the car." <u>Id.</u> at 02:23. But Shadmani did not comply, instead saying, "what do you mean, it's a folder, I was just at a friend's house." <u>Id.</u> at 02:24–02:30. Officer Barnes told Shadmani that "to [him] it looks like cocaine," and that he was going to have to investigate further. <u>Id.</u> at 02:30–02:36. Officer Barnes then instructed Shadmani to again place his feet inside the patrol car. <u>Id.</u> at 02:37. But Shadmani still did not comply, and Officer

Barnes told Shadmani that he was "on the verge of resisting and [did not] want to have to yank [Shadmani] into the car[.]" Id. at 02:40–02:45. Shadmani eventually complied, and Officer Barnes secured him in the back seat of the patrol car. Id. at 02:52.

With Shadmani secured, Officer Barnes asked Officer Scott whether she also saw a white powdery substance in Shadmani's vehicle. See Barnes Declaration at 4. Officer Scott confirmed that she saw the substance, and stated that she believed it to be cocaine. See Scott Declaration at 3. Officer Scott then obtained a drug test kit from her patrol car and tested the white powdery substance. Id.[3] The field test yielded a presumptive positive result for cocaine.

---

[3] In his Response to the Officers' Motion, Shadmani "contest[s] the notion that any substance was field tested at this time by Officer Scott." Response to Officers' Motion at 5. However, Shadmani fails to cite to any evidence in the record to dispute that this occurred. As the "non-moving party [Shadmani] must go beyond the pleadings and 'identify affirmative evidence' that creates a genuine factual dispute." Lexmark Int'l Inc. v. Universal Imaging Indus., LLC, 699 F. Supp. 3d 1266, 1276 (M.D. Fla. 2023) (quoting Crawford-El v. Britton, 523 U.S. 574, 600 (1998)). Because Shadmani has failed to provide any evidence to dispute that Officer Scott field tested the white powdery substance, the Court will not view this unsupported argument as a fact weighing in his favor. Indeed, it is difficult to see how Shadmani could actually dispute that the field test occurred, as the BWC Footage affirmatively shows Officer Scott conducting what appears to be a field test of the white powdery substance, and Shadmani, who was seated in the backseat of one of the police cruisers, was not in a position to observe her actions. See BWC Footage at 03:13; Brooks v. Miller, 78 F.4th 1267, 1278 (11th Cir. 2023) ("[I]f a valid recording completely and clearly contradicts a party's testimony, that testimony is not credible, and the court should disregard it."). Thus, for the purposes of summary judgment, the Court will not view this unsupported assertion in Shadmani's favor.

In citing to Lexmark, the Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

Id. Officer Barnes then began to search the front seat of Shadmani's vehicle. See Barnes Declaration at 4. During this search, Officer Barnes found a "folded business card in the driver's side door that had the same powder [on it] as the folder." Id. at 5. And he also found what appeared to be "counterfeit money underneath the driver's seat." Id. Believing that he had probable cause to arrest Shadmani for possession of cocaine and drug paraphernalia, Officer Barnes decided to place Shadmani under arrest. Id.

The First Use of Force. With the intention of arresting Shadmani, Officer Barnes walked back to his patrol car, advised Officer Scott that he was going to "read" Shadmani and place him in handcuffs, and opened the patrol car's door. See BWC Footage at 04:10–04:32. As soon as Officer Barnes opened the door, Shadmani began to ask him to call a narcotics detective. Id. at 04:33. Shadmani then exited the backseat of the patrol car and Officer Barnes instructed him to turn around. Id. at 04:38. Shadmani hesitated, so the Officers forcibly grabbed both of his hands. Id. at 04:38–04:44. Shadmani then began telling the Officers that "I'm not doing anything," and asked the Officers to "let [him] explain" the situation to them. Id. at 04:42–04:48. The Officers told Shadmani that he needed to relax, but Shadmani kept insisting that he was "not doing anything," and told the Officers that he was an informant. Id. at 04:48–05:07. The Officers attempted to handcuff Shadmani, but perceived him to be tensing his arms and body, preventing them from doing so. See Barnes Declaration at 6; Scott

Declaration at 4.[4] Officer Scott ordered Shadmani to "stop resisting," to "stop tensing [his] arms," and to stop "pushing off of the car." BWC Footage at 05:10–05:23. Unable to handcuff Shadmani, and perceiving him to be resisting arrest, the Officers began to strike Shadmani in his knee and back. See Deposition of Amir Shadmani at 156–57 (Doc. 48-13; Shadmani Deposition).[5] Afraid for his life, Shadmani began struggling with the Officers, broke free from

---

[4] Shadmani contends that he never attempted to tense his arms to resist being placed under arrest. See Shadmani Deposition at 152 ("**Q:** So you admit you were tensing your arm? **A:** I was not. And, again, I was not. My brain was telling me, your arm is about to break."). But, Shadmani concedes that the Officers may have perceived him to be tensing his arms due to the way his arms were positioned behind his back. See id. ("The reason [the Officers] felt like I was tensing my arms is because they had my arm pulled up to the back of my neck."). Even if the Court were to accept Shadmani's characterization of his conduct, the Court must analyze a reasonable officer's perception of Shadmani's conduct, not Shadmani's actual intent. See Jones v. Michael, 656 F. App'x 923, 929–30 (11th Cir. 2016) (the Court must analyze how the situation could "have been perceived to be by a reasonable officer, even if the reasonable perception was mistaken in the ultimate sense"). Because Shadmani admits that a reasonable officer could have perceived him to be tensing his arms, the Court does not credit Shadmani's characterization of his conduct, but instead finds that a reasonable officer could have perceived Shadmani's tensing to be an attempt to resist arrest. See Baker v. Clements, 760 F. App'x 954, 958 (11th Cir. 2019) (finding that "it was reasonable for Defendant Officers to perceive Plaintiff's failure to present his right hand to be handcuffed as a sign of intentional resistance").

In citing to Jones and Baker, the Court notes that it does not rely on unpublished opinions as binding precedent, but that they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[5] The Officers dispute that they ever kneed or punched Shadmani during the First Use of Force. See Barnes Declaration at 6; Scott Declaration at 4. However, as the BWC Footage does not clearly discredit Shadmani's version of events, the Court views this fact in his favor for the purposes of summary judgment. See Brooks, 78 F.4th at 1271–72 ("When the action happens off camera and the audio doesn't clearly contradict the plaintiff's story," the Court must "accept the nonmoving party's version of the facts in determining whether to enter summary judgment").

their hold, and started running away. See Shadmani Deposition at 161; BWC Footage at 05:26–05:32.

The Second Use of Force. With Shadmani on the run, Officer Barnes radioed that "we're in a fight," and both Officers took off in pursuit of him. See BWC Footage at 05:33. Officer Scott attempted to deploy her Taser, but was unsuccessful. See Scott Declaration at 4. Officer Barnes also deployed his Taser, and successfully struck Shadmani's back. See Barnes Declaration at 6. Once hit by Officer Barnes' Taser, Shadmani fell to the ground, see BWC Footage at 05:36, and Officer Scott jumped on top of Shadmani and started striking him in the head with her Taser. Id. at 05:38–05:41.[6] However, Shadmani broke free and ran away. Id. at 05:41. While running away, Shadmani turned around and swung his fist, leading Officer Barnes to believe that Shadmani was attempting to punch him. Id. at 05:42; Barnes Declaration at 6.[7]

---

[6] Officer Scott concedes that she struck Shadmani with her Taser, but contends that it was unintentional, as she only intended to strike Shadmani with her closed fist. See Scott Declaration at 6 ("When I looked at my right hand, I realized I was still holding the TASER. I did not realize that I still had my TASER until that point. But as soon as I realized I was still holding it, I immediately discarded the TASER. I then continued to strike Mr. Shadmani with an empty, closed fist[.]").

[7] Shadmani disputes that he attempted to punch Officer Barnes, and contends that he was merely trying to pull the Taser probes out of his back. See Shadmani Deposition at 171 ("All I could do is turn around trying to get something that's pulling on my back."). As noted earlier, even if the Court were to accept Shadmani's characterization of his conduct, the Court must analyze a reasonable officer's perception of Shadmani's conduct, not Shadmani's actual intent. See Jones, 656 F. App'x at 929–30. Upon review of the BWC Footage, the Court finds that a reasonable officer could have perceived Shadmani to be attempting to punch Officer Barnes. See BWC Footage at 05:42.

The Third Use of Force. With Shadmani again on the run, Officer Barnes deployed his Taser, and Shadmani fell to the ground once more. See BWC Footage at 05:43–05:45. Officer Scott then jumped on top of Shadmani and started striking him in the head with her closed fist. Id. at 05:46–05:48. Shadmani was briefly able to get on his feet, but was tackled back down by the Officers. Id. at 05:48–05:52. At this point, Shadmani was face down on the ground, his arms were pinned underneath his stomach, and both Officers were on top of Shadmani striking him in the side and head. Id. at 05:53. The Officers yelled at Shadmani to stop resisting and ordered him to place his hands behind his back. Id. at 05:53–05:58. But Shadmani's hands remained pinned underneath his stomach. Id. at 05:59.[8] Officer Scott continued to strike Shadmani, and Officer Barnes continued to "drive stun" and strike Shadmani with his closed fist. Id. at 05:50–06:07.[9]

---

[8] Shadmani contends that he was not trying to resist the Officers' attempts to place him in handcuffs, but that he failed to place his hands behind his back because he could not move his arms. See Shadmani Deposition at 173 ("I couldn't comply the second time. I was under so much current of the electricity going through my body I was frozen. I could not even talk to them. I couldn't move my arm."). Again, even if the Court were to accept Shadmani's explanation, a reasonable officer could have perceived Shadmani's failure to place his hands behind his back as a further attempt to resist arrest. See Baker, 760 F. App'x at 958 (finding that "it was reasonable for Defendant Officers to perceive Plaintiff's failure to present his right hand to be handcuffed as a sign of intentional resistance"). This is true even if Shadmani's lack of compliance was merely a result of being physically unable to move his arms.

[9] Drive-stunning occurs when a Taser is placed on "the skin of a suspect" and is activated. Barnes Declaration at 8. It "is a technique that causes discomfort to disorient a suspect to comply with commands," but unlike the use of Taser probes, it "does not cause disruption of muscle function." Id.

Eventually, the Officers were able to get Shadmani's arms behind his back, but still were unable to handcuff him, so Officer Barnes continued to drive stun Shadmani. Id. at 06:07–06:16; Barnes Declaration at 7. Once the Officers were able to gain control over Shadmani, they ceased all use of force against him. Id. at 06:17; Barnes Declaration at 8. Officer Barnes then radioed that he had Shadmani under control. Id. at 06:50. And the Officers were able to secure Shadmani in handcuffs. Id. at 07:26. Shortly thereafter, additional police officers arrived at the scene, and Shadmani was placed in the backseat of a patrol car. Id. at 08:14–08:43.

## II.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[10] An issue is genuine when the evidence is such

---

[10] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine

that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines

---

dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves, 52 F.3d at 921 (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Discussion

Shadmani asserts four claims: (1) excessive force under 42 U.S.C. § 1983 against Officer Barnes, (2) excessive force under 42 U.S.C. § 1983 against Officer Scott, (3) municipal liability under 42 U.S.C. § 1983 against Sheriff Waters in his official capacity, and (4) battery under state law against Sheriff Waters in his official capacity. See Complaint at 9–14 (Doc. 1).[11] The Officers argue that they are entitled to qualified immunity because the force used against Shadmani did not violate the Fourth Amendment, and that even if it

---

[11] As to the claims brought against Sheriff Waters in his official capacity as the Sheriff of the City of Jacksonville, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Thus, references to Sheriff Waters in this Order should be construed as referring to the City of Jacksonville.

did, this violation had not been clearly established. <u>See</u> Officers' Motion at 23. Shadmani contends that the force used by the Officers was in violation of his Fourth Amendment rights and that this violation was clearly established. <u>See</u> Response to Officers' Motion at 20. For his part, Sheriff Waters moves for summary judgment on Shadmani's municipal liability claim arguing that there is no evidence that the City of Jacksonville had a custom or policy of allowing its officers to use excessive force. <u>See</u> Sheriff's Motion at 16. Sheriff Waters also moves for summary judgment on Shadmani's battery claim arguing that he cannot be held liable for the Officers' conduct. <u>Id.</u> at 20. Shadmani contends that there is sufficient evidence in the record to show that the City of Jacksonville had a custom or policy of allowing its officers to use excessive force, <u>see</u> Response to Sheriff's Motion at 12, and that Sheriff Waters can be held liable for the Officers' conduct. <u>Id.</u> at 13. For the reasons discussed below, the Motions are due to be granted in-part and denied in-part.

### A.   The Officers' Motion

In Counts I and II, Shadmani asserts that the Officers used unconstitutionally excessive force by striking and tasing him during his arrest. <u>See</u> Complaint at 9–11. The Officers request entry of summary judgment arguing that they are entitled to qualified immunity because their use of force was constitutional as a matter of law, and that even if it was excessive, this

conduct was not a clearly established violation of the Constitution at the time of the incident. See Officers' Motion at 24.

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[12] Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'[g]overnment officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful[.]" Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007); Lee, 284 F.3d at

---

[12] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

1194. Here, it is undisputed that, at all times material to this case, the Officers were acting in their official capacity and within the scope of their discretionary authority.[13] Accordingly, the burden shifts to Shadmani to demonstrate that qualified immunity is not appropriate using the test established by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

In accordance with <u>Saucier</u>, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the [Officers'] conduct violated a constitutional right[.]" <u>Id.</u>; <u>see also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002); <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting <u>Scott</u>, 550 U.S. at 377). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. <u>Hope</u>, 536 U.S. at 739; <u>Saucier</u>, 533 U.S. at 201; <u>Scott</u>, 550 U.S. at 377; <u>Underwood v. City of Bessemer</u>, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted). The Court

---

[13] "'A government official acts within [their] discretionary authority if the actions were (1) undertaken pursuant to the performance of [their] duties and (2) within the scope of [their] authority.'" <u>Jones v. City of Atlanta</u>, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting <u>Lenz v. Winburn</u>, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. <u>See</u> <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004); <u>see also</u> <u>Lee</u>, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which he was arrested).

may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009);[14] Underwood, 11 F.4th at 1328.

>  i. Excessive Force

Addressing the first question, the Court must determine whether the Officers subjected Shadmani to an unlawful use of force on September 17, 2019. Specifically, the Court must evaluate whether the Officers applied excessive force when they struck and tased Shadmani during his arrest. In conducting this analysis, the Court heeds the Supreme Court's caution that:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers

---

[14] In Pearson, the Supreme Court modified the procedure mandated in Saucier, permitting courts the discretion to determine which prong of the qualified immunity analysis should be resolved first. See Pearson, 555 U.S. at 236.

> or others, and whether he is actively resisting arrest or
> attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must
> be judged from the perspective of a reasonable officer
> on the scene, rather than with the 20/20 vision of
> hindsight . . . . With respect to a claim of excessive force,
> the same standard of reasonableness at the moment
> applies: Not every push or shove, even if it may later
> seem unnecessary in the peace of a judge's chambers,
> violates the Fourth Amendment. The calculus of
> reasonableness must embody allowance for the fact
> that police officers are often forced to make split-second
> judgments—in circumstances that are tense,
> uncertain, and rapidly evolving—about the amount of
> force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396–97 (1989) (internal citations and

quotations omitted); see also Croom v. Balkwill, 645 F.3d 1240, 1251–52 (11th

Cir. 2011); Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir. 2004);

Durruthy v. Pastor, 351 F.3d 1080, 1093–94 (11th Cir. 2003). Consistent with

this authority, a court uses the (1) severity of the crime, (2) danger to officer

safety, and (3) risk of flight, referred to as the Graham factors, to analyze the

reasonableness of an officer's use of force. See Lee, 284 F.3d at 1198. Indeed,

"Graham dictates unambiguously that the force used by a police officer in

carrying out an arrest must be reasonably proportionate to the need for that

force, which is measured by the severity of the crime, the danger to the officer,

and the risk of flight." Id.; see also Taylor v. Taylor, 649 F. App'x 737, 746 (11th

Cir. 2016). Significantly, "an officer will be entitled to qualified immunity . . . if

an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

As to the first Graham factor—the severity of the crime at issue—the parties dispute what crime Shadmani was thought to have committed. The Officers argue that they had probable cause to arrest Shadmani for possession of cocaine, see Officers' Motion at 17, while Shadmani contends that the Officers lacked any basis for a "legal arrest[.]" Response to Officers' Motion at 12. Under Florida Statute section 893.13(6)(a), "an individual is guilty of possession of cocaine. . . if he is 'in actual or constructive possession of a controlled substance unless such controlled substance was lawfully obtained from a practitioner or pursuant to a valid prescription[.]" Jasmin v. United States, No. 3:07-cr-218-J-32JBT, 2016 WL 6071663, at *7 (M.D. Fla. Oct. 17, 2016) (quoting Fla. Stat. section 893.13(6)(a)). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (quotation omitted). However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Grider v. City of Auburn, Ala., 618 F.3d 1240, 1257 (11th Cir. 2010). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the

same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff.'" Id. (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004)). "If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." Id. (citing Skop v. City of Atlanta, GA, 485 F.3d 1130, 1138 (11th Cir. 2007)).

Here, the Officers argue that because they saw "a white powdery substance on a black portfolio folder" in Shadmani's vehicle, and because Officer Scott field tested the white powdery substance and it came back presumptively positive for cocaine, they had probable cause to believe that Shadmani was illegally in possession of a controlled substance. Officers' Motion at 16–17. Shadmani concedes that there was a "white powdery substance" in his vehicle, see Shadmani Deposition at 144, but contends that there was no basis for a "legal arrest" as the white powdery substance never "tested positive for cocaine" and "was [n]ever logged in evidence." Response to Officers' Motion at 12. Shadmani's argument is entirely unavailing. From the perspective of a reasonable officer, Officer Barnes observed Shadmani "sweating, disheveled and sniffling," and saw that he "appeared to have bloodshot, watery eyes." Barnes Declaration at 3. Officer Barnes was also able to see inside of Shadmani's vehicle, and "observed a black folder in the passenger's seat that appeared to have a white powdery substance on it." Id. Based upon these observations, Officer Barnes placed Shadmani into his patrol car so that he

could investigate. Id. at 4. During this investigation, Officer Scott conducted a field test on the white powdery substance, and it "tested presumptively positive for cocaine." Scott Declaration at 3. Officer Barnes then conducted a search of Shadmani's vehicle and found a "folded business card in the driver's side door that had the same powder [on it] as the folder," and also found what appeared to be "counterfeit money" underneath the driver's seat. Barnes Declaration at 5. Viewing these facts in their totality, a reasonable officer would have had probable cause to believe that Shadmani was in possession of cocaine in violation of Florida Statute section 893.13(6)(a). As to the seriousness of this offense, because a "conviction for possession of cocaine pursuant to Fla. Stat. § 893.13(6)(a) constitutes a felony drug offense," this factor weighs in favor of the Officers. Thomas v. United States, No. 8:07-cr-203-T-27MAP, 2013 WL 4855067, at *6 (M.D. Fla. Sept. 11, 2013) (citing United States v. Neal, 520 F. App'x 794, 795 (11th Cir. 2013)).

The second Graham factor—the danger to officers or others—also supports the reasonableness of the Officers' conduct. Shadmani argues that "it is unreasonable to believe that [he] was an immediate threat to [the Officers] or his own safety." Response to Officers' Motion at 12. The Court is not convinced. Here, Shadmani was thought to be in possession of cocaine. When the Officers attempted to arrest him, Shadmani resisted their efforts, broke free from their hold, and ran away twice. As explained by the Supreme Court, "[t]he

attempt to elude capture is a direct challenge to an officer's authority. It is a provocative and dangerous act that dares, and in a typical case requires, the officer to give chase." Sykes v. United States, 564 U.S. 1, 9 (2011), overruled on other grounds, Johnson v. United States, 576 U.S. 591, 606 (2015). And give chase is what the Officers did. However, Shadmani did not submit to the Officers' attempts to restrain him. Instead, he continued to flee despite being tased and struck numerous times, and even swung his fist in Officer Barnes' direction. Based upon these facts, a reasonable officer could believe that Shadmani's resistance and flight posed a threat to officer safety. Accordingly, the Court finds that this factor weighs in the Officers' favor.

The third Graham factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—also supports the reasonableness of the Officers' conduct. Shadmani concedes, and rightly so, that he actively resisted arrest and fled from the Officers. See Response to Officers' Motion at 13 ("Any hesitation or active resistance only occurred following Officer's Barnes [sic] initial aggressive and violent contact[.]"). However, Shadmani contends that this factor still weighs in his favor because he was "cooperative and compliant" with the Officers' initial commands. Id. at 12–13. This argument is unavailing. Shadmani resisted the Officers' initial attempts to arrest him when he failed to submit to handcuffing. During this initial encounter, Shadmani struggled with the Officers, broke free from their hold, and started to run away. The Officers

chased after Shadmani, and Officer Barnes deployed his Taser, bringing Shadmani to the ground. Once on the ground, Shadmani struggled with Officer Scott, got back on his feet, and continued to flee. Officer Barnes then reactivated his Taser, and Shadmani fell to the ground once more. Shadmani attempted to get off of the ground and continue fleeing, but was forced back down by the Officers. The Officers, once on top of Shadmani, attempted to place his hands behind his back, but Shadmani's hands remained pinned underneath his stomach. Officer Barnes then began to drive stun Shadmani, and after a brief struggle, the Officers eventually were able to get control of Shadmani's hands and secure him in handcuffs. Based on these facts, a reasonable officer could believe that Shadmani was both actively resisting arrest and attempting to evade arrest by flight. Therefore, this factor weighs in the Officers' favor.

Accordingly, all three <u>Graham</u> factors—the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is attempting to resist arrest or evade capture by flight—weigh in favor of finding the Officers' use of force to be reasonable. The Court does not end its inquiry there, however. The Eleventh Circuit also instructs district courts to consider three other factors: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted[.]" <u>Lee</u>, 284 F.3d at 1197–98. The Court refers to these as "the <u>Lee</u> factors."

The first <u>Lee</u> factor—the need for the application of force—is answered by the <u>Graham</u> factors themselves. Shadmani's resistance to being placed under arrest, his multiple attempts to flee, and his perceived attempt to punch Officer Barnes shows that some level of force was needed to gain control of the situation. Additional force was then required when the Officers were unable to gain control over Shadmani's hands, and were unable to place him in handcuffs. Accordingly, this factor weighs in the Officers' favor.

The second <u>Lee</u> factor—the relationship between the need and amount of force used—weighs in the Officers' favor as well. As a threshold matter, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Id.</u> at 1197 (quoting <u>Graham</u>, 490 U.S. at 396). Therefore, "the typical arrest involves some force and injury." <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1351 (11th Cir. 2002) (citing <u>Nolin</u>, 207 F.3d at 1257–58)). And a "constitutional violation only occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." <u>Glover v. Eighth Unknown D.E.A. Agents/Drug Task Force Agents From Birmingham, Alabama Task Force</u>, 225 F. App'x 781, 785–86 (11th Cir. 2007) (quoting <u>Graham</u>, 490 U.S. at 397)). As Shadmani was subjected to three separate uses of force, the Court will discuss each one in turn.

<u>The First Use of Force.</u> During the first use of force, the Officers struck Shadmani in the knee and side while attempting to place him under arrest. As explained by the Eleventh Circuit, "[b]ecause a police officer is entitled to use some force to arrest a suspect, 'the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.'" <u>Myers v. Bowman</u>, 713 F.3d 1319, 1327 (11th Cir. 2013) (quoting <u>Nolin</u>, 207 F.3d at 1257)). Here, while attempting to execute a lawful arrest, the Officers perceived Shadmani to be tensing his arms and resisting their efforts to place him in handcuffs. In response to Shadmani's perceived resistance, the Officers began struggling with Shadmani, and struck him in his knee and side. Under the circumstances, this use of force was de minimis. See <u>Nolin</u>, 207 F.3d at 1255 (finding the force used to be de minimis when the officer "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, [and] kneed him in the back and pushed his head into the side of the van[.]"); <u>Woodruff v. City of Trussville</u>, 434 F. App'x 852, 855 (11th Cir. 2011) ("The kind of force alleged by [the plaintiff]—including [the officer] punching [the plaintiff] in the face, forcefully removing him from his car, and slamming him on the ground . . . constituted only de minimis force."). Even if the force used was not de minimis, the Officers were entitled to use some level of force to overcome Shadmani's perceived resistance, and a reasonable officer could believe that the strikes to Shadmani's knee and back were proportionate

to this need. See Brown v. City of Huntsville, Ala., 608 F.3d 724, 740 (11th Cir. 2010) ("For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls."). Thus, the Court finds that the Officers' first use of force was objectively reasonable.

The Second Use of Force. During the second use of force, Officer Barnes tased Shadmani while he was attempting to flee, and Officer Scott tackled Shadmani and struck him in the head with her Taser. As to Officer Barnes' use of his Taser, the Eleventh Circuit has held that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008). Indeed, when "a suspect appears 'hostile, belligerent, and uncooperative,' [the] use of a taser might be preferable to a 'physical struggle [causing] serious harm' to the suspect or the officer." Fils v. City of Aventura, 647 F.3d 1272, 1290 (11th Cir. 2011) (quoting Draper, 369 F.3d at 1278)). Here, Shadmani had just attempted to resist a felony drug arrest, broke free from the Officers while they were attempting to handcuff him, and started to run away. Under these circumstances, a reasonable officer could believe that it was necessary to tase Shadmani to ensure that he could be detained safely. See Draper, 369 F.3d at 1278 ("[The officer's] use of a taser gun to effectuate the arrest of [the plaintiff] was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop,

and did not constitute excessive force."). As to Officer Scott's strikes to Shadmani's head, despite being tased and falling to the ground, Shadmani did not submit to the Officers' authority. Instead, he got back on his feet and attempted to run away. In response, Officer Scott tackled Shadmani and begun striking him in the head. Due to Shadmani's continued resistance, a reasonable officer could believe that Officer Scott's strikes were necessary to gain control of Shadmani, and to ensure that he did not continue to flee. See Baker, 760 F. App'x at 957 (finding the use of force to be reasonable because "[w]hen Defendant Officers employed the fist strikes, Plaintiff had just attempted to evade arrest by flight and had refused multiple orders to get on the ground, to stop resisting, and to give his hands to the officers"). Accordingly, the Court finds that the Officers' second use of force was objectively reasonable.

The Third Use of Force. During the third use of force, Officer Barnes tased Shadmani, drive stunned him, and punched him, and Officer Scott struck Shadmani with her closed fist. Under the circumstances, a reasonable officer could believe that this use of force was reasonable. Notably, Shadmani had broken free from Officer Scott, gotten up from the ground, swung his fist in Officer Barnes' direction, and continued to run away. In response to Shadmani's continued flight, Officer Barnes reactivated his Taser and Shadmani fell to the ground. Officer Scott then tackled Shadmani and begun punching him, and Officer Barnes drive stunned and punched Shadmani. At this point, Shadmani's

hands were pinned underneath his stomach, and the Officers were still unable to gain control over him. Indeed, they radioed for assistance. After the Officers were able to get both of Shadmani's hands behind his back, they still struggled to handcuff him, causing Officer Barnes to drive stun Shadmani. Shortly after the drive stun, the Officers were able to gain control over Shadmani and place him in handcuffs. No further force was applied once this occurred.

As to Officer Barnes' tasing of Shadmani, as explained above, a reasonable officer could believe that it was necessary to tase Shadmani a second time when he continued to flee from the Officers. See Draper, 369 F.3d at 1278. Similarly, as to the Officers' striking of Shadmani, a reasonable officer could believe that the strikes were necessary to overcome Shadmani's continued resistance to being placed under arrest. See Baker, 760 F. App'x at 957. Finally, as to Officer Barnes' drive stunning of Shadmani, "the use of a Taser in drive-stun mode is generally held to be a preferred and lesser use of force than the potential escalation of physical force and brutality." Douglas v. Faldoski, No. CV 22-00079-CG-B, 2024 WL 2150264, at *8 (S.D. Ala. Apr. 16, 2024), report and recommendation adopted, No. CV 22-00079-CG-B, 2024 WL 2139382 (S.D. Ala. May 10, 2024) (quotation omitted). Thus, "[Officer Barnes'] decision to use his taser in this mode signifies an attempt to use a lesser amount of force to overcome [Shadmani's] resistance[.]" Id. And, considering that the Officers were still unable to handcuff Shadmani, a reasonable officer could believe that the

drive stuns were necessary to gain full control over the situation. For these reasons, the Court finds that the Officers' third use of force was objectively reasonable.

In sum, the Court finds that all three uses of force were proportionate to the need to place Shadmani under arrest. Accordingly, this factor weighs in favor of the Officers.

The third <u>Lee</u> factor—the extent of the injury inflicted—is likely neutral. Even if not life threatening, Shadmani appears to have suffered injuries to his lower back, shoulder, and nose, which have required multiple surgeries to fix. <u>See</u> Shadmani Deposition at 60. Although the Officers argue that "[t]here is no evidence in the record that [Shadmani's] injuries were a direct result of the [O]fficers' application of force," viewing Shadmani's testimony in the light most favorable to him, the Court finds that a question of fact exists as to whether the injuries can be attributed to the Officers' conduct. Officers' Motion at 22. That said, the evidence does not suggest that Shadmani's injuries are greater than what was needed for the Officers to ensure Shadmani's compliance. Thus, on balance, this factor is likely neutral.

Upon consideration of the record, and construing all disputed facts and inferences in Shadmani's favor, Shadmani cannot show that the Officers' use of force was objectively unreasonable. Given that Shadmani actively resisted arrest, fled from the Officers multiple times, and appeared to swing his fist in

Officer Barnes' direction, the Officers reasonably could have believed that their use of force was necessary to gain control of Shadmani. The Court thus determines that Shadmani has failed to show a genuine issue of fact for trial on his claims against the Officers. Therefore, the Officers are entitled to qualified immunity and summary judgment is due to be entered in their favor on Counts I and II of the Complaint. See Vinyard, 311 F.3d at 1346 ("An officer will be entitled to qualified   immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive.").

### ii. Clearly Established

Even if the Court were to find that the force used by the Officers was unconstitutionally excessive, Shadmani fails to point to authority supporting a conclusion that they violated a clearly established constitutional right. See Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004), abrogated on other grounds by Williams v. Aguirre, 965 F.3d 1147 (11th Cir. 2020). As the Supreme Court has explained:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Hope, 536 U.S. at 739 (citation omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). For purposes of this analysis, the critical question is

whether the state of the law gave the government actor "fair warning" that his alleged treatment of the plaintiff was unconstitutional. <u>Vinyard</u>, 311 F.3d at 1350 (quoting <u>Hope</u>, 536 U.S. at 741); <u>see also</u> <u>Marsh</u>, 268 F.3d at 1031 ("[F]air and clear notice to government officials is the cornerstone of qualified immunity[.]"). The Eleventh Circuit recognizes three sources of law that would provide a government official adequate notice of statutory or constitutional rights: "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." <u>Harper v. Lawrence County, Ala.</u>, 592 F.3d 1227, 1233 (11th Cir. 2010) (quoting <u>Goebert v. Lee County</u>, 510 F.3d 1312, 1330 (11th Cir. 2007)). Thus, where the words of the federal statute or federal constitutional provision are specific enough "to establish clearly the law applicable to particular conduct and circumstances," then the plaintiff can overcome the qualified immunity privilege, even in the absence of case law. <u>Vinyard</u>, 311 F.3d at 1350. In this type of "obvious clarity" case, "the words of the federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." <u>Id.</u>

Alternatively, where the conduct alleged is not so egregious as to violate a statutory or constitutional right on its face, courts look to case law to determine whether the law is "clearly established." <u>Id.</u> at 1351. If the case law

contains "some broad statements of principle" which are "not tied to particularized facts," then it may be sufficient to clearly establish the law applicable in the future to different facts. Id. However, to provide officials with sufficient warning, the case law must establish a principle with such "obvious clarity" that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Id. Last, in the absence of broad statements of principle, precedent can clearly establish the applicable law where "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar," to the particularized facts of prior case law. Id. at 1352. Such precedent must be found in decisions from the Supreme Court, the controlling circuit court of appeals, or the pertinent state supreme court. Id. at 1351. Although such a case "on all fours" with materially identical facts is not required to establish "fair warning" to government officials, see Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) (discussing the impact of Hope on Eleventh Circuit precedent), "existing precedent must have placed the statutory or constitutional question beyond debate." See Mullenix, 577 U.S. at 12 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

In his Response, Shadmani cites to Fils v. City of Aventura, 647 F.3d 1272 (11th Cir. 2011), for the proposition that the Officers' use of force was clearly excessive. See Response to Officers' Motion at 18. In Fils, the defendant-officers

responded to an ongoing dispute outside of a club and arrested one of the partygoers. <u>Fils</u>, 647 F.3d at 1276. The plaintiff, in reference to the officers' arrest of the partygoer, said that "these motherfuckers are overreacting." <u>Id.</u> at 1277. Unhappy with the plaintiff's retort, the defendant-officers drew their Tasers and tased the plaintiff. <u>Id.</u> When the plaintiff fell to the ground, the defendant-officers kneed him in the back, "applied a contact tase to the back of his neck," and placed him in handcuffs. <u>Id.</u> Because the plaintiff was not violent, did not disobey any orders, did not resist arrest, and posed no risk to the defendant-officers' safety, the Eleventh Circuit held that the "unprovoked force" used against the plaintiff violated his rights under the Fourth Amendment. <u>Id.</u> at 1289–90. The facts of this case, however, bear little resemblance to those in <u>Fils</u>. As discussed in detail above, Shadmani was thought to be in possession of cocaine (a felony); he resisted the Officers' attempts to arrest him; he fled from the Officers multiple times; he appeared to swing his fist in Officer Barnes' direction; and once on the ground, he failed to place his hands behind his back and allow the Officers to handcuff him. With these differences in mind, it cannot be said that <u>Fils</u> would have put a reasonable officer on notice that the conduct of the Officers was unconstitutional. <u>See</u> <u>Priester</u>, 208 F.3d at 926 ("[U]nless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.").

Moreover, this is not the sort of case where it is apparent, with "obvious clarity," that the Officers' conduct was unconstitutional. See Vinyard, 311 F.3d at 1350. In the face of an individual who has resisted arrest, fled from the police, and appeared to swing his fist in the direction of an officer, it cannot be said that the use of force in the manner shown here to apprehend and gain control of that individual is so clearly excessive as to warrant the denial of qualified immunity in the absence of any case law. For these reasons, even if Shadmani could show the violation of a constitutional right, he has not shown that this right had been clearly established.

## B. Sheriff Waters' Motion

In Counts III and IV, Shadmani asserts claims against Sheriff Waters in his official capacity as the Sheriff of the City of Jacksonville for (1) municipal liability under 42 U.S.C. § 1983 and (2) battery under state law. See Complaint at 12–14. Sheriff Waters moves for the entry of summary judgment on Count III arguing that Shadmani has failed to show that his constitutional rights were violated, and that even if his rights were violated, he cannot show that this violation was due to a policy or custom on the part of the City of Jacksonville. See Sheriff's Motion at 14. Sheriff Waters also moves for the entry of summary judgment on Count IV arguing that Shadmani cannot show that he can be held liable for the Officers' use of force. See id. at 22–23. The Court will address each argument in turn.

### i. Municipal Liability (Count III)

In Count III, Shadmani brings a claim against Sheriff Waters in his official capacity as the Sheriff of the City of Jacksonville, alleging that the "Sheriff's Office has a widespread custom and practice of using excessive force" and "failing to discipline its officers for the use of excessive force[.]" Complaint ¶ 52. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004); Underwood v. City of Bessemer, 11 F.4th 1317, 1333 (11th Cir. 2021) (same). As the Court has already found that Shadmani has failed to show that his constitutional rights were violated by the Officers, he necessarily has failed to establish that the City of Jacksonville can be held liable for this purported violation. See Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999) (emphasis added) ("To state a claim for relief in an action brought under § 1983, [a plaintiff] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of

state law."). Accordingly, summary judgment is due to be entered in Sheriff Waters' favor as to Count III of the Complaint.[15]

### ii. Battery (Count IV)

Having determined that summary judgment is due to be granted in favor of Defendants as to Shadmani's federal claims, the Court next considers whether to continue to exercise supplemental jurisdiction over Shadmani's remaining state law battery claim. At the time Shadmani filed the instant case, the Court had original jurisdiction over the federal claims, see 28 U.S.C. § 1331, as well as supplemental jurisdiction over Shadmani's state law claim, see 28 U.S.C. § 1367(a). See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). However, § 1367(c)(3) gives a court discretion to dismiss or remand to state court claims before it on the basis of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction[.]"

---

[15] Even if Shadmani had established that the Officers violated his constitutional rights, Sheriff Waters would still be entitled to summary judgment. In the Complaint, Shadmani alleges that the City of Jacksonville has "a longstanding practice" of using "excessive force against individuals who are not resisting[.]" Complaint ¶ 27. In support of this contention, he identifies nine different incidents involving the City of Jacksonville. See id. at 6–9. However, Shadmani has failed to support these allegations with any evidence, and Sheriff Waters has now come forward with evidence to the contrary. See Declaration of Steve Ijames at 3 (Doc. 48-11) (explaining how "none of the examples alleged in the Complaint . . . involve matters similar to the incident involving Amir Shadmani"). At summary judgment, Shadmani must "go beyond the pleadings and by [his] own affidavits" demonstrate a genuine issue for trial on these points. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Because Shadmani has submitted no evidence to show that the City of Jacksonville has a policy or custom of allowing excessive force, or failing to investigate claims of excessive force, Sheriff Waters is entitled to summary judgment regardless of whether the Officers did in fact violate his constitutional rights.

28 U.S.C. § 1367(c)(3). Indeed, the Eleventh Circuit has held that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law malicious prosecution claim should be heard in state court"); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1185–86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the

relationship between the state and federal claims[,]" as well as "the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (internal quotations omitted) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Cohill, 484 U.S. at 350 (citing Gibbs, 383 U.S. at 726–27) (footnote omitted); Gibbs, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)). Notably, the Supreme Court's directive in Cohill concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a general rule to be applied in all but extraordinary cases." Carr v. Tatangelo, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing Cohill, 484 U.S. at 350 n.7), aff'd, 338 F.3d 1259

(11th Cir. 2003). Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial. Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997).

Here, the Court has determined that summary judgment in favor of Defendants is proper with regard to Shadmani's federal claims. Because the federal claims have been dismissed prior to trial, the Court has the authority under § 1367(c) to decline to retain jurisdiction over the remaining state law battery claim. See Murphy, 329 F.3d at 1320; Carr, 156 F. Supp. 2d at 1380 (dismissing state law claims without prejudice after finding the defendants to be entitled to qualified immunity as to the federal claims and noting that it is preferable for state courts to "make rulings on issues of [state] law"). As such, the Court will decline to continue to exercise supplemental jurisdiction over the claim in Count IV of the Complaint, and this count will be dismissed without prejudice.

As to the claims against Sheriff Waters, Shadmani has failed to show that his constitutional rights were violated. Thus, he cannot show that Sheriff Waters can be held liable for the purported violation of his constitutional rights. Moreover, as Shadmani's federal claims have been dismissed, the Court will decline to exercise supplemental jurisdiction over his state law battery claim. Accordingly, summary judgment is due to be entered in Sheriff Waters' favor

on Count III of the Complaint, and Count IV of the Complaint is due to be dismissed without prejudice.

## IV.   Conclusion

Upon consideration of the record and the parties' arguments, the Court makes the following findings. As to Counts I and II, a reasonable officer in Officer Barnes and Scott's position could have believed that the force used against Shadmani was reasonable, and even if the force used was excessive, Shadmani has failed to show that the unreasonableness of such force had been clearly established. Thus, Officer Barnes is entitled to qualified immunity and summary judgment is due to be entered in his favor as to Count I. And Officer Scott is entitled to qualified immunity and summary judgment is due to be entered in her favor as to Count II. As to Count III, Sheriff Waters is entitled to qualified immunity because Shadmani has failed to show that his constitutional rights were violated. Thus, summary judgment is due to be entered in Sheriff Waters' favor as to Count III. Finally, the Court declines to exercise supplemental jurisdiction over Shadmani's state law battery claim, Count IV, and this count is due to be dismissed without prejudice.

Accordingly, it is

**ORDERED:**

1. Defendant Sheriff T.K. Waters' Motion for Summary Judgment and Memorandum of Law in Support (Doc. 46) is **GRANTED in-part** and

**DENIED in-part**. The Motion is **granted** with respect to Count III of the Complaint, and the Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendant Sheriff T.K. Waters and against Plaintiff Amir Shadmani as to this count. The Motion is **denied** as to Count IV of the Complaint. In the exercise of its discretion under 28 U.S.C. § 1367(c), the Court declines to continue to exercise jurisdiction over this claim, and Count IV is **dismissed without prejudice** to Shadmani refiling this claim in state court if he so chooses.

2. Defendants Barnes and Scott's Motion for Summary Judgment and Accompanying Memorandum of Law (Doc. 47) is **GRANTED**. The Motion is **granted** with respect to Counts I and II of the Complaint, and the Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Officer J.M. Barnes and Officer A.G. Scott and against Plaintiff Amir Shadmani as to these counts.

3. The Clerk of the Court is further **directed** to terminate any pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 11th day of October, 2024.

_Marcia Morales Howard_
**MARCIA MORALES HOWARD**
United States District Judge

Lc32

Copies to:

Counsel of Record